D. A. C. K. Good morning. My name is Ron Sandek, S-A-N-D-A-C-K. I have the privilege of representing the Roseland Community Hospital, the appellant in this matter. Good morning, Your Honors. My name is Terry Blanchard. I represent the appellees Douglas Beck, Maribel Torres, and Sharon Thurman in this matter. Thank you. Okay, thank you. Go ahead, please. Again, for the record, Your Honors, Ron Sandek on behalf of the appellant, and may it please the Court and Counsel. Over two years ago, a two-day trial occurred before the trial of fact. Immediately after all evidence was induced upon concluding arguments, a judgment was entered from the bench. Essentially, that judgment entered in favor of the plaintiffs against my client on a non-existing count. I want to emphasize that. A judgment was entered against my client against a case, a cause of action that did not exist. The difference was whether the cause of action count that had been dismissed on the judgment on pleadings was 13, 13 separation payments. The count that you went to trial was 26 separation payments. So why can't the proof of trial, the man that complained to, satisfy what was proved at trial? Well, that is what occurred, but I will tell you, Your Honor, two things that are instructive, and I think the Court ought to bear in mind. A good two months before trial, the trial court dismissed count one and count two of the plaintiff's multi-three count complaint. I say that dismissal was with prejudice, so how do you say that? Pursuant to Rule 273. Well, quick question. It did not say with prejudice. It did not judge with prejudice. That's not the basis of saying you have to say with prejudice if it's with prejudice. I would be incorrect in saying that there isn't case law on both sides of the coin. I would ask, Your Honor, to simply review the black letter statute 273, which in and of itself says, unless it's for venue, jurisdiction, or indispensable parties, the rule says a dismissal, an involuntary dismissal, is with, it concludes the matter in full. No. It's a ruling on the merits. It's a ruling on the merits of those counts. But that's where you're wrong, because you said it's in full, you said. No, it wasn't in full. There was still another count. Correct. But that's the difference. It says that when an order, it leaves a cause of action still pending, and that is undecided, it can't be a final order. So there was no final order. You could not have appealed it. In order to appeal that, are you saying that you could have appealed that without 304A language? No, I think that is correct. So you think, okay, so I agree with you. So if you need a 304A language, then it wasn't a final order. In a lot of cases. It was, Judge, it was dispositive of that cause of action. There was a three-count complaint on three distinctly different contracts. Three, I'm sorry, Your Honor, and two of those counts were dismissed, and I say they were dismissed in full on the merits. Meaning they could not be reviewed, they were tried before the court. They were not dismissed on the merits. They were dismissed on judgment on the plea. Correct. Okay. I'm sorry, go ahead. Well, and again, it's not a final order. Therefore, a judge can revisit those counts because a case is still pending it. And the statute that you referred to only talks about causes, cases, not just individual causes. Judge, I think my brief identifies case law that distinguishes from the, I'm sorry, Your Honor, you can't. I'm just wondering, is your point that they had two months to make a motion to amend their pittings and they didn't do this?     No, the most important thing is that they had two months to make a motion to amend their pittings and they didn't do this. What's the difference? The difference is on their merits. We went to trial, and this is the point that is important. We went to trial on one count. The other two counts were dismissed involuntarily. The reason you went to trial on one count, Mr. Sandak, is that you successfully argued that the integration clause in the 26 pay period contract superseded any 13 pay period contract. And as it turns out, the evidence didn't support that because the Court found the 26 pay period contract was not validly entered into. So you've kind of got the plaintiffs in a catch-22. You invoke the integration clause, and then when the Court says, but that contract is not the effective contract, plaintiffs are outlawed. Well, Your Honor, two things. The Court did find the integration clause dispositive. We argued actually two points. One, that there was no alternative plea, that from a procedural standpoint, the plaintiff failed to actually argue in the alternative. And we thought that necessarily was potentially dispositive. What complaint, excuse me, let me try that again, what contract are you saying is valid? I don't think that's an unseemly or really a beautiful thing to ask. As a matter of discretion, once the pro-Fed trial establishes that the only contract that was entered into, supported by the evidence, is the 13 pay period contract, I have a hard time saying that a trial court abuses its discretion when it allows the party to amend to conform to the proof. Well, I'll speak to that. But the reason that in this instance I think it's an interesting thing to do is, as the record reveals, there's only one document. Actually, there were two copies. There was one 13-week contract that the plaintiff had the lead proposed and said, by the way, we're not going to trial on it, but this is what was the first document used. As the defendant in the case, Rosen introduced, because it was in our files, a corresponding, because it was the only plaintiff that had a 13-week contract, Mr. Beck, a different 13-week contract. The court offered you the opportunity to present any additional language or any additional evidence that you wanted with respect to a claim under a 13-pay period contract.    I said, I have nothing further. That's correct. And the record is absolutely clear on that, Your Honor, because I have included evidence, and it went uncontested, another third copy. Let me show them clearly something, Your Honors. There's no written document that's been proposed in the underlying trial. We asked, and I unarthly invoked the best evidence rule. I was rebuked and reminded it's the original writing rule. But that foundation is absolutely essential because there wasn't one contract, neither the 13-week pay period contract or a 26-week, a 13-26 pay period, that had an original signature on it. And it was a plethora of evidence showing distinctions, markings, redactions, thought changes. And the evidence at trial was that there was a word document floating around amongst the plaintiffs and third-party witnesses. And one plaintiff said, by the way, she made changes to her document after the fact. It was not re-signed. Well, hers was re-signed, she said. Plaintiff Thornton said, I signed two contracts. One was on the 28th of May, and one was at some subsequent time, she said, June 4th or June 6th. She couldn't remember. She was the only plaintiff that took that position. And if you look at the record, I've been at those trials for a long time. I've had a harder time trying to recollect in a short, small case, just two days, with only five plaintiff witnesses having more of a more lumped record and who said what and who contradicted themselves. I think you're absolutely correct. The record is complete. You're correct. But that makes it harder for you, I think. Because we have to rely more on what the judge heard because of the credibility of the witnesses and so forth. I agree with theirs. Contradictories, testimony by the plaintiffs with each other, the defense witness, everybody. I mean, it's not a neat package at all. Yes, sir. I agree. And to the point of whether or not they say they helped you, how does that help you? Well, with all due respect to the trial court, there wasn't a very deliberate look. The opinion of the court changed, and look, I need to be careful here. I want to make sure I'm respectful. The opinion of the court came two seconds after the conclusion of closing arguments. The judge had the wrong contract. He was trying to enter the ruling on something that wasn't authoritative. He made mistakes on the names of the parties. Who said what? He made conclusions that he felt my witness not that credible. I get that. I think the record divides that with all due respect. There was two third-party witnesses. We can't relook at that. We can't relook at that, right? Well, in a use of discretion. But he made credibility determinations. And I think the record is replete with errors on the facts and the fact determination, but more importantly on the law. I'm standing here because I didn't get to it yet. Your Honor, you think a year after the fact, proofs to conform to the proofs, which I think is by definition almost prejudicial in and of itself. But if you think that's fair, if you think me coming into a trial and trying a case on a 13-week contract, on a 26-week contract, and then being told, no, it's something entirely different. It's something that I got dismissed two months prior. That's surprising by definition. Has that become the law of the case? Is there – I think you made an argument. I did. The law of the case in the record. I did. How does that follow here? How does that – why should we or should we use that? If you watched the trial court's kind of remedy and evolution of the judgment – and by the way, I think he says, again, with all due respect, in the last order, I think he says he denied the request to revisit the April ruling, the judgment on the pleadings. I think that's clear that he denied it. But if he denied it, how does he come, again, to resurrect his ultimate conclusion at post-trial, which is a 13-week contract? I don't know how you get there. The law of the case is that case is – the 13-week matter is dismissed. So let's assume it. So all we have in the trial is a 26-week agreement. And according to the court, the trial was going to be about authority to enter into the 26-week agreement, right? And what happened is it became that plus, right? Well, that's what the trial court – that's what the judge said. I never agreed. My case was always defending on the four corners of a document that I believe is illicit. And we made the case, I think, again, in, obviously, per se, the trial judge. I think Judge Snyder understood that. He understood that these were at-will employees, that they had no right to these separation agreements, but that the board, through its lax oversight or its failure to circumscribe Ms. Champin's authority, vested her with the authority to enter into these agreements. That's what he was focusing on. I think he was, Judge. But I think that was, frankly, abuse of discretion because before you can get to authority, you have to say the propriety of the document offered meets a smell test. They put forth a contract. Judge, I think there were, like, six of them. Which one is it? That's what I was fighting. You talked about what I had to battle. Not only were there inconsistent witnesses contradicting themselves with prior affidavits, pleadings, and their own testimony before I even had to impeach them. They did that for themselves. Other than 13 pay periods versus 26 pay periods and the extension of health care, what else are you concerned about? The details. The quality of the contract itself, Your Honor. But that's another issue. But you're saying all these different versions of the contracts. As I understand it, the operative terms are we're going to pay you for either 13 pay periods or 26 pay periods, and we're going to extend your health care for the same period. So who do I see about that if that's the operative terms? Because there's only one 13-week contract in existence. They put forth one. I put forth one. They're not the same. They have font changes. They have language changes. They have redactions. They have scribblings. There's nothing with respect to two other plaintiffs. So how does the trial court, he does not say, I find an oral contract is reached here. Had he done that, I would agree with you, Your Honor, that there is an ample record upon which he could make that ruling. As we stand here, I'm standing in front of you because there's only one plaintiff named in one contract of which there are two versions, both of which are copies, and neither of which apply to the other plaintiffs. Yet there's a judgment in their favor. And the president's secretary said, I, at her request, prepared three agreements, four actually, one for Powell, was it? All the same. We were all in a room. They all signed. Chapman was there. Well, that's what Powell says. Croswell, who prepared the documents, remembers, Powell is the president's CEO. She directs Croswell, both of nine parties, to prepare these documents. I say there's ample evidence in the record. That was a self-indulgent request from Ms. Powell. Croswell agrees with me. She prepared one for Diane Powell, the only contract party that issued, but not issued this case. But what's important, Your Honor, is to take that down as necessary logical conclusion. Croswell and Powell do not agree with each other. My initial brief, and I apologize for some pretty drawn writings and some compare and contrast, but that's the status of this case. Croswell and Powell do not agree. Croswell says she saw Powell sign those documents. Not in one signing ceremony, not with Genevieve Chapman there, and not with the plaintiffs there. So who am I supposed to believe? Had the court said, I believe Powell, I believe Croswell, I merge these two facts in finding. Remember, we're talking about a 13-week contract that does not exist for two of the three plaintiffs. A quantum leap of logic and law and fact. And frankly, that would be plain injustice. I was boxing shadows, Judge, throughout that trial. The record was replete with contradictions in that regard. You said in your reply brief that Beck's testimony and Torres' testimony was that they only signed one version of the agreement. Yes. Providing for 13 paid periods of severance, and that later the first page was switched out. So if that's true, we do have testimony, and we do have a near acknowledgment that that aligns. Well, what happened? So here we have an agreement that was signed by the parties. Well, Judge, that would be great if that were in a vacuum. But here's two things, Your Honor. One, we don't know which of the two documents Beck signed. If you read the back and forth with the gentleman, he was adamant in one respect. You're quite correct, Justice. There was one signature he says. The other witness says she signed twice. That was Ms. Thurman. Torres says she signed once, and that there was a substitution of pages. After the fact. Now, whether it was a 28th or two days after. Now, remember, this is a plaintiff who had said the contract was signed on May 26th. So if you look at the testimony, without patting myself on the back, I think I impeached her credibility on that issue pretty profoundly. Why it wasn't made a part of the record, I cannot speak to that. But that's part of the errors. And there were errors in admission of evidence and, unfortunately, the credibility of the witnesses. I know that may not be something you want to hear. But trying to leave, and, frankly, I will put this out there, I think the court divined a judgment on whole cloth on Thurman and Torres' behalf. There is not one copy of a document bearing her signature on a 13-week contract. I just want to remind you that if you want to reserve some time. I do, Judge. I do a lot of what I was going to say. I do. And so if you think I should be reserving now. I think that's good. A couple more questions. Do you think, would you, could you see then a difference in our ruling regarding Beck versus the other two? I think it will. I mean, I would be convinced if I heard that. Yes. But what you're saying, you take what you're saying. To be consistent, the answer of the honor would be yes. There is a record to, I mean. We want to reverse the other two and affirm them.  That's what you're saying. That would be consistent. I'm saying that would be accurate. Absolutely consistent. And it would at least follow logic and reason, which I think has been absent in this record. May I make one more further comment to your question? Remember, sir, we, I can't remember if it was 8, 9, or 10. I used to have these exhibits indelibly in my brain. One of the exhibits we put into trial was Mr. Beck's contract that we had in our file, which was different. So to the answer, yes, there's a 13-week contract. Which one would your Honor on Appeal pick as enforceable, which kind of, I guess, encapsulates. The difference is that one includes the termination language and the other one does not. Correct. Thank you. And that's the last point, and now is your time. In my report brief, I put out one important fact that I wish the trial court had addressed. There's no evidence that contradicted Ms. Chapman's testimony that these plaintiffs were not terminated. In fact, there is a legitimate argument that the contract was rejected, revoked, and nullified by her telling each of the plaintiffs, you are not fired, come back to work. A really important thing that the trial court never addressed. We made the record, and I think it's something for your Honors to contemplate. And with that, I will reserve whatever time I have left. Thank you. Thank you. First, I want to address a couple of the questions that the panel has brought up here. One question I believe you had was, did we wait or sit on our rights for two months when we got that order dismissing counts one and two? And I believe we sort of addressed this in the brief, but I do want to say that we had a trial date, and the plaintiffs, this has been a very big hardship on the plaintiffs. And if you can put yourself into their shoes, this is what happened to them. The plaintiffs have decided to work for Roseland Hospital, an underprivileged, underserved hospital serving the south side of Chicago. The people don't have insurance, don't have money, but need medical attention. So Doug, who was the director of operations, Maribel was the director of nursing, Sharon was the director of community resources, and they made up the executive team. So these are people who chose to work under very difficult circumstances. These are people who would take pay cuts when the budget was tight in order to keep the hospital going. Did they have a record? Yes. The pay cuts that they took? Yes. The years that they took them? There were, well. The amounts? I don't know the amounts offhand, but it's sort of like formal days, you know, that city workers take. I'm just asking if there's any evidence of any of that. There is. There is. That was asked, and that was at trial, that they would take that. But at this point in May of 2013, things were dire for Roseland. It seemed as though the hospital was going to close. The state either wouldn't give money or couldn't give money to Roseland to keep it operating. And it was always the intention of Roseland Hospital through its president and CEO, Diane Powell, to protect the people who had served Roseland in this difficult time. We introduced, count one was a salary continuation agreement that was introduced, that happened approximately a month before this happened. And that was introduced to show that it was always the intent to make sure these people had some severance. That was also for 13 pay periods of severance. Because these are people who had been good to Roseland, and through no fault of their own, there was never any allegation that Roseland was in a position it was in because of these people. They worked hard. There was never any allegation of malfeasance. They were just in a difficult circumstance with Roseland. So we went to trial because these people need money. Doug Beck and all of the plaintiffs really needed the money that they had bargained for in this agreement. So that is one reason why we didn't appeal or try to appeal that ruling that occurred in April. No, we did argue it. And the reason why we didn't is because we didn't want to disturb the trial date. At that point, Mayor Bill already had a job. She's the director of nursing in a hospital in the Washington, D.C. area. And the plaintiffs really, really wanted to get this past them. Okay. They really wanted a trial, but they didn't do anything to get count two, which is the 13-week contract. Well, we did object to it. We put arguments forth why it shouldn't have been. I'm sorry. These were at-will employees? Yes. So theoretically, they could have been fired at any time with no sufferance package. That's true. And that is something that the trial court pointed out. That is very true. Is this a law of the case, then, when the first and second counts were dismissed on the pleadings? Is that a 26-week contract law of the case? I don't believe so, Your Honor. And the reason is? It was not final. It was not appealable. And we have – and if you want to talk about that, I can skip to that, Your Honor. We – it was not a final adjudication on the merits, and therefore the trial court could allow plaintiffs to refile count two to conform the pleadings to the proof as referenced in 735 ILCS 5-2-616C. And we believe, one, it was not a final adjudication on the merits because, one, there was no 304A language in the order, and that's J. Ekinson's and Lozman v. Putnam. And we also are relying on the Village of Niles case that states to be final and appealable, a judgment or order must terminate the litigation between the parties on the merits so that if affirmed, the trial court only has to proceed with the execution of the judgment. So in this case, that was not true because the defendant still had to answer or otherwise plead and proceed to trial. The Village of Niles court goes on to state, while the order need not dispose of the issues presented in the pleadings, it must be final in the sense that it disposes of the rights of the parties either upon the entire controversy or upon some definite and separate part thereof. In this case, Counts 2 and 3 are very intertwined, and we believe that they involve the same facts, the same testimony, they involve the same determination as to whether Diane Powell had authority. And Counts 2 and 3 are really happening almost simultaneously. The testimony was that on May 28, 2013, all of the plaintiffs and Chapman, who was the chairman of the board of directors, and Diane Powell, who was the president and CEO, had a meeting. They signed these 13-week agreements. The 13 pay period agreements was to give the plaintiffs 13 pay periods of severance.  And that testimony was also supported by Dwayne Fitch, who testified in this case via evidence deposition that there was a matrix in which gave Diane Powell authority to enter into these separation agreements. But Mr. Sandek, his argument is we still don't know which agreement, except for Mr. Beck, possibly, as to the other two for sure. But I still contest Mr. Beck. What's the agreement? Which 13-week agreement? Where is this agreement? Where is it signed? Where is, you know, actually is the, which one is the final? The agreements were entered into evidence, Your Honor, and the But he's objecting to that. He's saying you can't He's objecting too late. And as I pointed out in my brief, Your Honor, we admitted all of the separation agreements in the evidence. There was no objection. So is there a 13-week agreement in the record for Torres and Thurman signed by them? I believe they didn't have their copies. But there were copies of the agreement. They did not have originals. The copies of the agreements with their signatures? No. I actually don't. I recall it was just one. It was just that one? Right. That's my recollection. If that's the case, there was testimony that corroborated their statements that they had the same agreement that Dugbeck had for the 13 pay periods. But the actual agreements, when you look at, when you spread them out, what's in the briefs and what's in the record, they don't look the same. They're different. There were changes. There are changes in the fonts. There are changes in the line order. There are changes in word paragraphs and pages. And they're not the same. So you can't say there was testimony that they all signed the same agreement because what's in the record is not the same. Substantially, they're the same agreement. But they're not the same document, which indicates that perhaps there were some pages changed with the availability of copiers and computers. Who knows what happened. But what we're looking at is three sets of documents. One is consistent with itself, and the other two are not consistent with it. So how are we to believe that they're authentic? Copies of anything that was authentic. Well, what are we supposed to do here? I believe the trial court made that determination. Well, your colleague says the trial court never made a finding that there were oral contracts for the other two. Is that a correct statement? Did the trial court make an oral finding, a finding, a specific finding that there were oral contracts for the other two? He did not make a specific statement that there was an oral contract. So if there was no finding that there were oral contracts and we're left with copies of documents that are dubious, what are we supposed to do with them? The trial court took the evidence that was presented to him. There was testimony that all three plaintiffs signed substantially what was Doug Betz's agreement. They're not saying the same thing. They are basically saying the same thing. They're giving them 13 paid periods of severance, Your Honor. Okay. That's your story. That's great. Well, that's not just my story. But we're looking at documents that are facially different. So they're not the same. They have the same content, but they're facially different. So you can't say the secretary prepared these three documents, presumably stem out of the same word processor. They look the same. They said the same thing. They were the same. And all three people signed them. A, the judge never found there were oral contracts. And B, no one looking at these documents can say they're the same. But I think substantially the documents were the same, and I believe that's what the trial court found. So when the trial court entered judgment on count two, he is taking into consideration the evidence that was presented. And count two was resurrected after it had been dismissed, and opposing counsel was prepared for the 26-week contract and the argument on that. So now all of a sudden he's arguing about a 13-week contract that the court has already said doesn't count. No, I don't know how the appellant can be surprised in this case because the 13-week separation agreement was always argued. We took depositions on it. It was argued at trial. They asked their witnesses or the plaintiffs and all of the witnesses about the 13-week separation agreement. So there was no surprise. Just summarize for me. He's complained about the confusion among the witnesses and the disparity in their testimony. Tell me what they were the same on. They're the same that there was an agreement for 13 pay periods of severance. And they're agreeing that that's based on the same document that includes that their employment was being terminated? Yes, but the board already told them that they weren't being terminated. The testimony is that during that May 28th meeting, they were essentially terminated at that point. They were given separation agreements. The terms of the separation agreement is that they were going to be terminated on June 21st. So they kept working for three weeks, during which time there could be another executive team brought in. The management of Roseland Hospital kept operating during this time, even though they were told that the board had terminated their employment. That's what the testimony shows. And so they were told that by Powell. They were told that by Powell. And that's what they believe. That's what the separation agreement says. That they were effectively terminated at that point. So, we were, I was discussing that counts two and three were not definite and separate. And so, in that way, this was not a final adjudication on the merits. If you look at Gleicher, Gleicher can be distinguished from the facts of this case, because in Gleicher, the trial court found and the appellate court agreed that the facts did not support the causes of action that were dismissed. And essentially, those claims were defective in that case. And the Gleicher court also went on to specifically state that a dismissal of a complaint for failure to state a cause or a claim is an adjudication on the merits. However, in this case, Your Honors, the facts pled and do support count two. And the court awarded judgment on count two. What about your cross-appeal regarding the 26 weeks? Yes. How would you explain, if you would, how we get there, based upon the judge's findings regarding the 13 weeks? And why should we then ignore that and go to 26? Well, first of all, we believe the correct standard of review is de novo because it involves interpretation of a contract. We believe that the trial court found, and this is consistent, that Powell had authority to enter into the agreement for 13 pay periods and the agreement for 26 pay periods. There had never been anything done by Rosalyn to stop her authority. Once the court determined that Powell had authority to enter into the 26 weeks agreement because of the presence of the merger clause, the trial court should not have considered the consideration that was present in the 13 pay period agreement. So you're saying that when Judge Schneider said the conversations about 26 weeks were not supported by any consideration, he should just have ignored that. But there was consideration. He should have looked at the consideration that was in those contracts and not outside the four corners of the contracts. That's the purpose of the merger clause, is that previous conversations and previous considerations and previous discussions aren't considered. So once he establishes that Powell did, in fact, have authority and that is supported by the evidence, that you don't look outside the four corners of that particular agreement for consideration that was cited in another agreement. So allowing plaintiffs to amend their pleadings to conform to the proofs that it was not an abuse of discretion. The amendment furthered the end of justice in this case because the evidence did support that the plaintiff should be awarded count two. There was no surprise. This was a count that had been present from the inception of this complaint and it had been argued at trial. The defendants had presented evidence at trial. Even if they could argue surprises to any of this, it was remedied because the trial court reopened proofs. Because the trial court reopened the proofs and allowed appellant to introduce whatever evidence that it wanted to and it just refused to do so. And we would like to point out that the amendment occurred prior to the final judgment and after appellant was allowed to introduce additional evidence. Thank you. Five minutes. Thank you. Justice Hyman, I wanted to address one thing. Early on you asked me a question about finality of the 273 rule. I would be remiss if I didn't at least revert back to my brief in which there still is case law support for the fact, because this wasn't part of the alternative, because it was dispositive with respect to distinct contracts, not just causative action. And I think that's important because you asked another question of counsel. Maybe it was Justice Patusky. What wasn't said here is instructive because I think just the trial court, Judge Schneider, basically tried to fashion a remedy as best he could based on a pretty discombobulated record. And I'm not going to, it just is what it is. But he fashioned an equitable remedy or an equitable right remedy when he took a bad count and resurrected it post-trial. But what's important here, essentially plaintiff, and this is in response to other questions, is trying still with respect to the record to put a square pattern around her. What wasn't pled was a Toronto-Maryland or an oral contract. That wasn't pled. What wasn't pled was a causative action in the alternative. Instead, it was a three count, standalone, three separate contract. And by definition, you've got to pick, if you're a plaintiff, which contract is it? And so Judge Schneider picked that contract because the plaintiff wouldn't. It's diametrically impossible to say, I have a 13-week contract, but I have a 26-week contract. Which one plaintiff do you stand on? Plaintiff would not make that election. We made it for her or them because we had to. We needed to know what case we were defending. And when Judge Schneider entered his room in April, I say that was definitive because it made it clear we were on one count, count three, a 26-week contract. That's what the case was. Now, I say to Justice Pachinki's good questions, you look at those documents, spread them out. Your eyes might go in the back of your head, but if you look at them, they are not the same. They reflect. I said at the trial, shenanigans, tampering, self-indulgence, what have you. Because these are plaintiffs working amongst themselves with two cooperative, third-party, yes, one was the chief executive officer, no doubt about it, but there was a lot of self-indulgence in those documents. They can be seen by looking at them and plainly inspecting them. And two, the question of which 13-week contract it is, the court never made a finding. The judge never made a finding. Even though we wanted him to try that case, he ruled a 13-week contract for all three plaintiffs even though only one exists, and there's two versions. How does a defendant defend themselves? The term surprise is used in the case law. The surprise was rampant in this case. And unfortunately, it worked to the prejudice of Rosenhausch. I go back to the question I asked you, Mr. Sandak. The court gave you the opportunity to reopen the proofs and introduce any evidence that you wanted, and you declined. Yes, but let me be clear about it. It's their evidence that's bad. What am I supposed to do? Try and say other than what I said? Judge, look at the two. It's a party that argues unfair surprise. Correct. And then is given the opportunity to present evidence to alleviate the surprise and says, no, I don't have anything else. May I politely push back, Justice, because it wasn't that we were surprised by the number. We're talking about a cause of action. We were there to try a 26-week pay period. Unbeknownst to us, apparently we were trying something entirely different. So when a judge says, what proofs do you want to reopen, I don't know which case I'm defending. Well, who's surprising you, though? I'm sorry?  It's the judge. I won't put it in the bag, but I do think the judge is surprised. But the judge is hearing evidence. I mean, you read the trial transcript, and there's as much conversation about the 13 pay periods as there is about 26, right? I can't put on the plaintiff's case. I defended it. Absolutely. And let me try answering both justices' questions. I'm not putting the plaintiff's case on. I made a motion to dismiss because there had been no election planning. There were three causes of action. They cannot stand one contract is the contract of issue. That was essentially what I was arguing, and Judge Snyder agreed. He dismissed the – I forgot what it was called. It was a contract that was back in May 3rd of 2015, a continuation agreement. I never understood what that was for, but it was dismissed. Then the 13-week contract. We simply said this plaintiff must prove because – these plaintiffs must prove because they're seeking justice and they're seeking an action on each contract. Which contract is it? So when Judge Snyder said, what proofs do you want to open? That wasn't for me to open. It was for them to elect which cause of action at trial they would be raising. Right. But when he said post-trial, you claimed surprise. I did. And he said, okay, if you're surprised and we're really now looking at these 13-pay period contracts, what else do you want me to know? And he said, I don't have anything. Correct. And, Judge, when we went to argue that, had the court then gone through a litany of fact-finding as to the propriety of the 13-week contract that he is now resurrecting. First of all, he did not vacate his order of April 2015. An absolutely crucial fact. That order is still the order in that case. He dismissed it. He didn't say, I vacate what I did. So how he ultimately came again to the 13-week contract defies any support in the record. But then, having then written your ruling from the bench, I find as follows. That all the plaintiffs have made a pause of action. Signing an either-or contract for the two plaintiffs where there's no 13-week contract and picked which bet contract he found was positive. Then, I think your questions to me would have significant import because I would have had to take those issues on. There's no record of that. There's no finding by the trial judge of this is the contract I find and I'm now spreading it to two plaintiffs who don't have 13-week written contracts. That's the surprise. And I unarticulately called that shadow boxing because I thought I was there on three 26-week contracts, which I was ready to defend and say there were fundamental problems in those documents if you do the spread-out test and compare-and-contrast test. Never got to that. With all due respect, the pause of action before the trial are fact. Both after the conclusion of evidence and then after resurrection is devoid of any discernible record in this court. If you look at the trial transcript, if you look at what's been admitted in evidence, where there are two 13-week contracts, they are different and they only apply to one plaintiff. I think if you look at the entirety of this record, I do not know how it isn't reversed outright. I thank you for your time and attention. Thank you. Mr. Counsel, we'd like to thank you all for your fabulous briefs and great argument. It's been very interesting and very helpful. We'll take this case under advisement. We're going to adjourn for a few minutes and then the court will call the next case.